UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Clutch Auto Ltd., <br><br> Plaintiff, <br><br> v. <br><br> Navistar, Inc., <br><br> Defendant. | Case No. 12 C 9564 <br><br> Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

This is a breach of contract action arising from a November 11, 2011 release signed by the parties. The parties dispute whether Defendant Navistar, Inc. fulfilled its contractual obligations to "work with" Plaintiff Clutch Auto Ltd. to sell certain clutches that Plaintiff already had manufactured.

The parties have filed cross-motions for summary judgment. For the following reasons, Defendant's motion [148] is granted and Plaintiff's motion [152] is denied.

## I. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary

judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

**II. Facts[1]**

**A. 2006 to June 2011: Initial Supply Agreement**

The relationship between the parties began in 2006. DSOF ¶ 12; PSOF ¶ 1. Defendant is a manufacturer of commercial trucks and a distributer of clutches used as service (replacement) parts. DSOF ¶ 5. Defendant sources clutches from approximately 1,400 suppliers globally. DSOF ¶ 7

Around 2006, Defendant was looking for a new supplier to compete with Eaton Corporation ("Eaton"). DSOF ¶ 11; PSOF ¶ 6. Eaton was the dominant North American clutch supplier and manufactured a popular self-adjusting clutch. DSOF ¶ 10. Self-adjusting clutches, unlike manual adjusting clutches, automatically tighten as they wear down, thereby decreasing the frequency of repairs and extending the clutch's lifespan. DSOF ¶ 13. It was at this time that Defendant was introduced to Plaintiff, an Indian company founded in 1971 that manufactures clutches. DSOF ¶¶ 1, 12; PSOAF ¶ 32.

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendant's statement of undisputed facts [151], with Plaintiff's responses [169]. "DSOAF" refers to Defendant's statement of additional facts [167], with Plaintiff's responses [174]. "PSOF" refers to Plaintiff's statement of facts [154], with Defendant's responses [167]. "PSOAF" refers to Plaintiff's statement of additional facts [169], with Defendant's responses [172].

2

On June 18, 2008, the parties entered into a three-year supply agreement (the "2008 Supply Agreement") with two automatic one-year extensions unless a party gave 90 days' notice of its intention not to renew the Agreement. DSOF ¶¶ 19-20; PSOF ¶ 9. Under the 2008 Supply Agreement, Plaintiff agreed to develop and manufacture manual and self-adjusting clutches. DSOF ¶¶ 14, 19; Mehta Fifth Aff. [169-1] ¶ 7. Defendant sold the self-adjusting clutches under its brand name: MaxxPower. DSOF ¶ 23.

Over the initial three-year term of the 2008 Supply Agreement, Defendant did purchase and install some clutches. *E.g.*, DSOF ¶ 28. However, there were disputes between the parties, namely, purported quality problems with the clutches Plaintiff manufactured. *See, e.g.*, DSOF ¶¶ 29-31. In February 2011, Defendant gave Plaintiff the requisite contractual notice that it was not renewing the 2008 Supply Agreement beyond the initial term. DSOF ¶ 33.

### B. July 2011 to November 2012: Dispute Resolution and Promotion Efforts

#### 1. Dispute Resolution

Plaintiff objected to Defendant's decision not to renew the 2008 Supply Agreement. In a July 12, 2011 letter, Plaintiff, among other things, demanded compensation for clutches it had manufactured, allegedly at Defendant's direction, but Defendant had not purchased. DSOF ¶ 34.

After months of negotiations, the parties reached a settlement resolving the disputes raised by Plaintiff's July 12, 2011 letter. DSOF ¶¶ 35-37. They memorialized their agreement in a letter dated November 9, 2011 (the "2011 Letter

3

Agreement"). DSOF ¶ 37. Defendant agreed to pay $575,545 for and accept delivery of certain clutches that were already built (Sections 1 and 3); to sell these clutches under the Clutch Auto brand name, not the MaxxPower brand name (Section 2); and "[to] engage in good faith negotiations for a new Service Parts supply agreement with Clutch Auto on terms that are agreeable to both parties" (Section 4). DSOF ¶¶ 37-41. In exchange, in Section 5 of the 2011 Letter Agreement, Plaintiff agreed to execute a complete written release of its claims, including those identified in the July 12, 2011 letter. DSOF ¶ 41; *see* 2011 Release [151-31].

On November 11, 2011, the parties executed the "Release of Claims by Clutch Auto" (the "2011 Release") contemplated by Section 5 of the 2011 Letter Agreement. DSOF ¶ 41; PSOF ¶ 18. Beyond just releasing Plaintiff's claims, the 2011 Release further obligated Defendant to "work with" Plaintiff to sell the remaining inventory of clutches. DSOF ¶ 42. It states in relevant part:

> … Navistar agrees to work with Clutch Auto to sell as Service Parts the clutch products already built by Clutch Auto and identified in the July 12, 2011 Letter as inventory from EDI visibility and forecasts, and, except as otherwise set forth in this Agreement, Navistar shall have no obligation to order or pay for any clutch products (including such inventory) from Clutch Auto until such inventory has been sold by Clutch Auto[.]

DSOF ¶ 42; 2011 Release [151-31]. Plaintiff has valued the "inventory from EDI visibility and forecasts," which is the subject matter of this lawsuit, at $4,543,000. PSOAF ¶ 30. That inventory included both manual and self-adjusting clutches

4

(although the record does not show how many of each). Mehta Fifth Aff. [169-1] ¶ 60; *see also* 3/19/15 Hr'g.

Beginning in December 2011, the parties began negotiating a new service parts supply agreement, as contemplated by the 2011 Letter Agreement. DSOF ¶ 49. The parties finalized a new service parts supply agreement in May 2012 (the "2012 Supply Agreement"). DSOF ¶ 49. The Agreement also imposed a "work with" obligation on Defendant:

> Buyer [Defendant] will work with Seller [Plaintiff] to assist in the promoting of the Seller's products in the market place. Buyer's ability to provide assistance in marketing will be limited without marketing funds from Seller. Seller will have the primary responsibility to provide marketing materials and services with Buyer's approval for such materials necessary.

2012 Supply Agreement [151-24] § 17B. Plaintiff does not claim in this litigation that Defendant breached the 2012 Supply Agreement.

### 2. Promotion Efforts

The parties dispute whether Defendant fulfilled its obligations to "work with" Plaintiff under the 2011 Release to sell the "inventory from EDI visibility and forecasts." 2011 Release [151-31]. This Court limits its discussion to the promotion efforts taken (or not) after November 11, 2011, when the parties entered into the 2011 Release.

***Dealership network.*** Defendant promoted the clutches to its dealer network—including its largest customers, Rush Enterprises Inc. ("Rush") and Chicago International Trucks, LLC. DSOF ¶¶ 58-60. Dealers are intermediaries who sell the clutches to end users. Defendant: (1) supplied the dealers with

5

marketing materials; (2) advised them how to market Plaintiff's clutches; (3) offered rebates; and (4) offered free shipping. DSOF ¶¶ 58-61. The marketing materials compared the Clutch Auto brand clutches favorably to their counterpart clutches from Eaton. DSOF ¶ 59.

Plaintiff responds by questioning the sufficiency of Defendant's efforts in two ways. It first asserts that Navistar disparaged the clutches in communications with customers. PSOAF ¶ 21. However, Plaintiff has failed to cite or attach any disparaging email or other communication. *See* PSOAF ¶ 21. Plaintiff instead relies principally on conclusory statements from Vijay Mehta, its Chairman and Managing Director. *E.g.*, Mehta Fourth Aff. [154-1] ¶¶ 1, 42. Second, Plaintiff argues, again through the testimony of its Chairman, that the financial incentives Defendant offered were customary industry practice. DSOF ¶ 62 (response cites Mehta Fifth Aff. [169-1] ¶ 40).

*Networking.* The record contains an email from Defendant where it introduced the General Manager of Clutch Auto Pioneer Clutch, Inc. ("CAPCI") to the Parts Director at Rush. DSOF ¶¶ 17, 63. CAPCI is a company that shares a common shareholder with Plaintiff and that warehoused and delivered Plaintiff's clutches. DSOF ¶¶ 17-18. The Parts Director is responsible for all Rush dealers that sell parts distributed by Navistar. DSOF ¶ 63. Defendant argues that the email shows that it made a business connection for Plaintiff, *see* DSOF ¶ 63, but Plaintiff disputes that argument. Plaintiff argues that the email was not aimed at

creating a strategic partnership between Rush and CAPCI, but rather at giving the Parts Director at Rush a contact for field support. DSOAF ¶ 21.

*Marketing.* Defendant offered three annual marketing programs to its suppliers: My Edge, Parts Expo and Supplier Advantage. Mark Johnson, Defendant's Vice President of Marketing, testified that a supplier's failure to engage in the My Edge and the Supplier Advantage Programs would harm their clutch sales. PSOF ¶ 28; Johnson Dep. Tr. [154-3] at 22:7-20.

The parties dispute whether Defendant offered to involve Plaintiff in the three marketing programs after November 2011. DSOF ¶¶ 51, 55. Defendant argues that Plaintiff was required to but did not pay to participate in the programs, despite Defendant soliciting marketing funds during the negotiations culminating in the 2012 Supply Agreement. DSOF ¶¶ 55-56; DSOAF ¶ 10; 2012 Supply Agreement [151-24] § 17B. Those facts are undisputed, but the record also contains testimony from Mehta that Plaintiff offered to provide Defendant with marketing funds but Defendant did not identify any marketing opportunities. DSOF ¶ 51; Mehta Fourth Aff. [154-1] ¶ 36. Defendant also argues—and Plaintiff does not dispute—that one of the programs, Supplier Advantage, did not begin until 2013, after the initiation of this lawsuit. DSOAF ¶ 19.

Two other marketing initiatives are disputed. First, Plaintiff argues that it sent a detailed marketing plan to Defendant sometime on or after August 2012, but Defendant ignored the plan. The parties have submitted conflicting affidavits from employees disputing whether Plaintiff in fact submitted a marketing plan. DSOAF

7

¶ 24; PSOAF ¶ 11. The purported plan is not in the record. Second, the parties dispute whether Plaintiff ever offered to host a pizza party to market its clutches and further dispute the value expected to result from that party. DSOAF ¶ 15; PSOAF ¶ 16.

*Meetings.* The parties had several conversations that were meant to improve the sales of Clutch Auto clutches, including:

- In December 2011, the parties had an in-person meeting and Defendant advised Plaintiff about steps Plaintiff should take to build the Clutch Auto brand and improve sales. DSOF ¶ 52.

- Around July to August 2012, in response to an email from Mehta inquiring about a sales plan, there was a conference call among Mehta, Defendant's Director of Global Parts Procurement, Debra Wilson, and Defendant's Chief Procurement Officer, Persio Lisboa. Wilson Dep. Tr. [151-15] at 56:23-58:5, 61:5-8. Defendant informed Plaintiff that Defendant would be downsizing and asked Plaintiff about its clutch sales goals. Wilson Dep. Tr. [151-15] at 57:22-58:5. Mehta has testified that there was no substantive discussion about selling Plaintiff's clutches during this call. Mehta Fifth Aff. [169-1] ¶ 41.

- In August 2012, the parties, including Defendant's products team, met in-person to discuss the lagging clutch sales and to develop a strategy plan. Wilson Dep. Tr. [151-15] at 59:9-60:14.

- In September 2012, Mehta sent Wilson strategy and marketing materials so that Defendant could develop a marketing strategy. Wilson Dep. Tr. [151-15] at 60:15-23.

- In November 2012, the parties had a conference call where Defendant provided advice about addressing the buildup of Plaintiff's clutch inventory. *See* 11/2/12 Agrawal Email [151-23]; *see also* DSOF ¶ 64; Mehta Fifth Aff. [169-1] ¶ 42.

Plaintiff argues that, on the whole, the communications between the parties were infrequent and not substantive. PSOAF ¶ 9. Plaintiff argues that Defendant

8

avoided returning calls from Plaintiff, refused requests for in-person meetings and did not timely host a marketing strategy meeting. PSOAF ¶¶ 9-12.

***Bonus.*** Defendant offered a $1,500 bonus to sales personnel who reached certain sales goals selling Clutch Auto clutches. DSOF ¶ 62. A single sales manager, but no one else, received the bonus. DSOAF ¶ 1. Defendant argues that the requirements for the bonus were too onerous to be effective. Mehta Fifth Aff. [169-1] ¶ 40.

***Internal emails.*** Plaintiff cites internal Navistar emails that purportedly disparage Plaintiff. PSOAF ¶¶ 22-23. One email includes the line: "we [Defendant] don't want to spend a lot of time promoting [Plaintiff's] product." PSOAF ¶ 22. Defendant disputes Plaintiff's interpretation of these emails. *See* PSOAF ¶¶ 22-23.

### III. Analysis

There is no dispute that Illinois law governs the alleged breach of the 2011 Release. To prove a breach of contract in Illinois, Plaintiff must show: (1) the existence of a valid and enforceable contract; (2) substantial performance by Plaintiff; (3) a breach by Defendant; and (4) resultant damages. *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007). The issues of breach and damages are disputed in the cross-motions for summary judgment.

#### A. Damages (Element 4)

Plaintiff seeks two categories of compensatory damages: (1) the clutch sales Plaintiff allegedly lost because Defendant breached the "works with" requirement of the 2011 Release; and (2) certain expenses. [168] at 11, 15; [173] at 7-8. Summary

9

judgment is warranted here because Plaintiff has failed to prove its damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 631; *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 674 N.E.2d 948, 950 (Ill. App. Ct. 1996). In short, the record is devoid of evidence from which a trier of fact could conclude with reasonable certainty that Defendant's breach caused Plaintiff's purported damages.

### 1. Lost Sales

To recover for a breach of contract in Illinois, Plaintiff must establish that it sustained damages and a reasonable basis for computing those damages. *TAS Distributing*, 491 F.3d at 632; *see also Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 910-11 (N.D. Ill. 2001). Plaintiff bears the burden of establishing its lost sales damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 631-32; *see also Von der Ruhr v. Immtech International, Inc.*, 570 F.3d 858, 866 (7th Cir. 2009); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 406-07 (Ill. 2006). Otherwise, only nominal damages are recoverable at this Court's discretion. *TAS Distributing*, 491 F.3d at 631-32. Absolute certainty is not required. *Id.* at 631-33.

The Seventh Circuit's decision in *TAS Distributing* is materially indistinguishable from the case at bar and thus is dispositive. *TAS Distributing* involved an agreement licensing two proprietary engine idling technologies to an engine manufacturer. 491 F.3d at 627. The License Agreement obligated the licensee to make "all reasonable efforts" to market and sell engines containing the

licensed technologies: "Licensee shall make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement." *Id.* at 628. Engine sales were poor and the licensor sued the licensee. The licensee had an average of fewer than 200 sales annually—far below the expectation of the parties who anticipated sales growing to 12,000. *Id.* at 629.

The licensee moved for summary judgment, arguing that the licensor could not establish damages with reasonable certainty. *Id.* at 629-30. The district court granted the motion and the Seventh Circuit affirmed. *Id.* at 627, 629-30.

The licensor measured its damages as lost profits: what it would have earned in royalties had the licensee made "all reasonable efforts" to market and sell the engines. *Id.* at 631. To calculate those damages, the licensor benchmarked its lost sales against: (1) the superior sales achieved by Detroit Diesel Company ("DDC"), another licensee and competitor who sold engines containing one—but not both—of the licensor's proprietary technologies; and (2) sales projections offered by the licensee during pre-agreement negotiations. *Id.* at 629, 634.

Neither supplied a reasonable basis for computing damages. Comparing the sales achieved by the licensee and DDC was a stretch. The two sold inherently different products. *Id.* at 635-36. DDC sold engines with one of the proprietary technologies whereas the licensee sold engines with both. *Id.* Moreover, the record contained scant evidence of DDC's actual sales. *Id.* at 636. The licensor had

11

introduced a single affidavit from its president asserting the approximate number of engines DDC sold annually. *Id.*

The Seventh Circuit also discounted the pre-License Agreement sales projections. *Id.* at 636-37. Based on the parole evidence rule, the licensor could not use the projections to alter the License Agreement and set a minimum sales floor.[2] *Id.* at 636-37.

Here, the record of damages is even less compelling than the record in *TAS Distributing*. Plaintiff argues it would have sold its entire remaining inventory had Defendant not breached the 2011 Release. [173] at 9; PSOAF ¶ 38. In support, Plaintiff principally relies on a conclusory affidavit from Mehta, its Chairman. PSOAF ¶ 38. Mehta states: "Had Navistar worked with Clutch Auto under the Release Agreement, Clutch Auto would have been able to sell the inventory of clutches in the United States." Mehta Fifth Aff. [169-1] ¶ 61; *see also* PSOAF ¶ 38. Based upon this conclusion, Plaintiff values its entire inventory at $4,543,000. [173] at 7-8; PSOAF ¶ 30.

Mehta's testimony falls far short of what the law requires at this stage of the proceedings. First, Plaintiff has not laid a foundation for his testimony. Federal Rule of Evidence 701 excludes lay testimony based on "specialized knowledge." *See also* Fed. R. Evid. 701 cmt. In the context of lost profit damages, lay testimony

---

[2] It bears noting that it is immaterial that *TAS Distributing* analyzed lost profits and not lost sales (the type of damages at issue here). Determining lost profits by its very nature first requires a determination of lost sales. Courts, not surprisingly, have analyzed lost profits and lost sales using the same legal framework. *E.g., M.S. Distributing Co. v. Web Records, Inc.*, No. 00 C 1436, 2003 WL 21087961, at *10 (N.D. Ill. May 13, 2003).

12

generally is impermissible except in limited circumstances not present here. *Von der Ruhr*, 570 F.3d at 862-66.

In *Von der Ruhr*, the plaintiff (the licensee) had licensed a modified human protein and argued that it would have developed the protein into a drug to treat sepsis had the defendant (the licensor) honored their licensing agreement. *Id.* at 860. The principal of the plaintiff sought to testify as a lay witness at trial about the sales the drug would have achieved had the licensing agreement not been breached. *Id.* at 863. The district court, however, granted a motion *in limine* barring that testimony. *Id.* at 860-61.

The Seventh Circuit affirmed. *Id.* at 860. The principal could not testify about lost damages based on his personal knowledge. *Id.* at 862-66. Even though the principal had licensed and commercialized other medical products, he lacked knowledge of the sepsis market and had not conducted a market analysis. *Id.* The record here shows that the same is true with Mehta. He has not conducted a market analysis, and Plaintiff has not otherwise laid a foundation for Mehta's conclusory testimony regarding suspected damages.

Second, even if admissible under Rule 701, Mehta's testimony is based on the kind of speculation and conjecture that Illinois courts consistently have discredited when determining whether a plaintiff has carried its burden of proving damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 633 (collecting Illinois cases). Furthermore, conclusory statements cannot be used to avoid

summary judgment. *FirstMerit Bank, N.A. v. Balin*, No. 11 C 8809, 2012 WL 4017948, at *4 (N.D. Ill. Sept. 11, 2012) (collecting Seventh Circuit cases).

Mehta provides no basis for his damages calculations. *See* [168] at 15; DSOF ¶¶ 84-88, 91-93. He does not address, for example, the myriad of facts that may otherwise have curtailed clutch sales even if Defendant had not breached the contract, such as a lack of market penetration or a negative brand reputation. DSOAF ¶ 12.

Plaintiff next cites to certain documents identified only as R1, R10, R11, R13 and R22 and argues that those documents prove damages. [168] at 11 (citing PSOAF ¶ 39). The documents are not in the record and cannot be considered by this Court. *See Kinesoft*, 139 F. Supp. 2d at 910 (non-moving party must marshal evidence showing a disputed issue of material fact at summary judgment). Nor has Plaintiff explained how the documents prove its damages claim.

In fact, the record shows just the opposite. This Court understands from Defendant's expert report that R1, R10, R11, R13 and R22 regard the existence and value of the clutch inventory. Spry Expert Report [172-1] at 30. Valuing the clutch inventory does not show, however, that Plaintiff would have sold the inventory absent Defendant's purported breach.

Plaintiff last identifies Defendant's expert report as corroborating the existence of damages. [168] at 12; [173] at 8. The expert wrote:

> As shown on Schedule R22, the damages alleged in this category include the sales value of inventory on hand at the Meridian warehouse, ICD New Delhi, Faridabad Plant and Bhiwadi. As Clutch Auto is claiming out of pocket costs, I have corrected the claim amount

14

> which is at the sales value of the inventory on hand by the 70.35% cost estimate to arrive at an adjusted claim amount of $3,196,001.

PSOAF ¶ 40 (quoting Spry Expert Report [172-1] at 28).

This excerpt does not save Plaintiff. It merely shows that the parties disagreed about the proper valuation of the inventory covered by the 2011 Release. But the value of the inventory matters only if Plaintiff first proves that it sustained damages due to lost sales and submits a reasonable basis for computing those damages. *TAS Distributing*, 491 F.3d at 632. Far from corroborating Plaintiff's damages claim, the expert concedes that Plaintiff did not make those predicate showings: "there is no guarantee that the inventory would have been sold, which makes this element of damages inherently speculative." Spry Expert Report [172-1] at 29.

Finally, even if the record contained sufficient evidence of damages (which it does not), Plaintiff's damages claim is barred under Illinois law. Under the Illinois new business rule, new businesses and, relevant here, established businesses selling new products cannot recover lost profits as damages. *TAS Distributing*, 491 F.3d at 633; *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995); *Kinesoft*, 139 F. Supp. 2d at 908; *Tri-G*, 856 N.E.2d at 407. The rationale for the rule is that damages cannot be ascertained with any degree of certainty for new businesses and new product lines. *TAS Distributing*, 491 F.3d at 633; *Kinesoft*, 139 F. Supp. at 908; *Milex Products, Inc. v. Alra Laboratories, Inc.*, 603 N.E.2d 1226, 1236 (Ill. App. Ct. 1992).

Plaintiff argues that it was an established business with success selling clutches. [168] at 14; PSOF ¶ 5; PSOAF ¶¶ 32-34. Plaintiff claims to have sold thousands of clutches in North America since 1988. PSOAF ¶¶ 34-35. Plaintiff also argues that its inventory of clutches covered by the 2011 Release served as replacement parts for Eaton clutches—an established brand. [168] at 14; PSOAF ¶ 37. That is not enough, however, to overcome application of the rule.

Here, it is undisputed that the breach involves the sale of clutches branded with the Clutch Auto name and for sale in the United States. DSOF ¶ 39; *see also id.* ¶¶ 73-74. Some of these clutches were self-adjusting. Mehta Fifth Aff. [169-1] ¶ 60; *see also* 3/19/15 Hr'g. The record fails to show that the clutches Plaintiff previously sold (which are not described in detail in the pleadings) are comparable to the clutches at issue here—some or all of which are clearly different in function and brand name. Brand reputation is a factor that drives sales in the market for clutches, DSOAF ¶ 12, so even a comparison between identical clutches sold under two different names is inappropriate.

At bottom, while Plaintiff has shown that it is an established business, it has failed to show that the clutches covered by the 2011 Release are an existing product such that the new business rule does not apply.

A survey of Illinois cases shows that the rule is applied broadly. First, the Seventh Circuit in *TAS Distributing* applied the new business rule where the licensee had been selling approximately 200 engines annually containing the two

proprietary technologies—a new product—and even though a competitor had been selling engines containing one of those technologies for years. 491 F.3d at 635.

Second, in the *Stuart Park* case, an investment company with a track record of successful real estate ventures sought lost profit damages for an unsuccessful investment in an apartment complex. 51 F.3d at 1328. The Seventh Circuit, however, discredited the company's track record of success and affirmed the district court's decision barring lost profits evidence at trial based on the new business rule. *Id.* The investment at issue in *Stuart Park* was made in a new market and thus was a new product. *Id.*

Last, the Court in *Kinesoft* invoked the new business rule where a five-year old software company had not sold any video games of the type at issue in the litigation. 139 F. Supp. 2d at 909-10. The Court found that, unlike in *Milex Products*, the software company's expert had not done any analysis of a comparable company selling comparable games. *Id.* at 910. The Court also rejected the software company's argument that the new business rule did not apply because the company's employees had a track record of success. *Id.* at 909; *see Milex Products*, 603 N.E.2d at 1231-32, 1236-37 (finding that the new business rule did not apply because the plaintiff's damages expert's testimony was based on extensive analysis of actual products in the ovulation drug marketplace and a historical analysis of how generic drugs fare when introduced into a market).

Without an appropriate track record of selling clutches in the United States under its own name or other "special evidence," *see TAS Distributing*, 491 F.3d at

17

634-35, such as expert testimony evaluating how the Clutch Auto brand clutches would have fared in the market, Plaintiff cannot avoid summary judgment or escape application of the new business rule. For this additional reason, Plaintiff cannot recover its lost sales damages.

### 2. Expenses

Plaintiff also seeks as damages the following categories of expenses, which total $1,319,590:

- $22,151 for outside consultants;
- $11,678 for travel expenses for Indian staff;
- $5,277 for travel expenses and salary for an employee;
- $404,606 associated with financing obtain from banks;
- $162,636 for inventory insurance and freight charges;
- $615,131 for the operation and maintenance of CAPCI's warehouse;
- $22,933 for travel expenses incurred by CAPCI employees; and
- $75,178 for taxes and insurance for CAPCI's warehouse.

DSOF ¶¶ 84-88, 91-93.

Likewise, Plaintiff has not proven these damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 631; *Sterling Freight Lines*, 674 N.E.2d at 950. The record does not show to a reasonable degree of certainty—nor does Plaintiff point to any evidence—that the $1,319,590 in expenses were caused by Defendant's purported breach. *See TAS Distributing*, 491 F.3d at 632-33 (requiring causation). Many categories of Plaintiff's expenses, such as warehouse maintenance charges, insurance and salary, appear to be routine overhead expenses that would have been incurred in the ordinary course of business. Overhead expenses cannot be recovered as damages due to their very inviolate nature. *Sterling Freight Lines*, 674 N.E.2d at 951-53.

18

Further supporting this Court's conclusion, Plaintiff has failed to marshal the documentation to support its claim for expenses. As Defendant argues, *see* [171] at 14-15, its expert reviewed Plaintiff's purported documentation of damages and concluded that she "was unable to substantiate any of the claimed damages." Spry Expert Report [172-1] at 6-7. Plaintiff has not rebutted this testimony. Instead, Plaintiff initially sought greater expense damages, but reduced that amount in reliance on Defendant's expert. *See* DSOF ¶¶ 84-88, 91-93. Defendant's expert concluded, based on the documentation Plaintiff submitted, that Plaintiff frequently had sought to recover expenses incurred before November 2011, when the 2011 Release could not yet have been breached.

Based on this record, this Court cannot say that a reasonable trier of fact could conclude that Plaintiff has proven its claim for expenses.

### B. Breach of Contract (Element 3)

Having concluded that there is no genuine issue of material fact as to the damages element, this Court need not, and does not, consider the alternate ground for summary judgment advanced by Defendant. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## IV. Conclusion

Defendant's motion for summary judgment [148] is granted and Plaintiff's motion for summary judgment [152] is denied. Plaintiff has not proven its damages to a reasonable degree of certainty or avoided application of the Illinois new business rule. This Court, moreover, exercises its discretion and declines to award

19

nominal damages even if Plaintiff were able to prove that Defendant breached the 2011 Release. *See TAS Distributing*, 491 F.3d at 632.

Dated: March 19, 2015

                                                Entered:

                                                John Robert Blakey
                                                United States District Judge